IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31238-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JULIO J. DAVILA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury found Julio Davila guilty of second degree murder. The key piece of evidence tying Mr. Davila to the murder was a baseball bat containing Mr. Davila's DNA.[1] During trial, Mr. Davila did not know that the forensic analyst who tested the DNA had been fired from her job due to a long history of incompetence in conducting DNA tests. The trial court denied Mr. Davila's motion for a new trial based on the prosecution's failure to disclose this information. On appeal, Mr. Davila contends the State's failure to disclose material evidence impeaching an important witness for the State violates *Brady*.[2] He also contends the prosecutor committed

---

[1] Deoxyribonucleic acid.
[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

misconduct by arguing inconsistent theories of culpability at two separate trials.

We conclude that there was no *Brady* violation because there was no evidence of DNA cross contamination in this case and, therefore, the nondisclosure of the information was not material. We also conclude that no prosecutorial misconduct took place. A prosecutor may argue inconsistent theories of culpability at separate trials when, as here, new evidence comes to light after the first trial, which supports the second theory. We, therefore, affirm.

## FACTS

In the early morning hours of June 18, 2007, Jeramie Davis called 911 to report that he had discovered John G. Allen, the owner of an adult material bookstore, on the store's floor. When Officer Brian Cestnik responded, he found Mr. Allen unconscious on the floor with a baseball bat under his knees. After paramedics took Mr. Allen to the hospital, Officer Cestnik placed the baseball bat on a shelf close to where Mr. Allen had been found. Mr. Allen later died at a hospital due to blunt force trauma to the head.

Officer Cestnik interviewed Mr. Davis. Mr. Davis told the officer that he found Mr. Allen on the floor earlier that evening, but thought he had passed out, so he left. According to Mr. Davis, he later returned to the bookstore at the encouragement of his sister and then called police. An investigator later swabbed four areas of the baseball bat

2

and submitted the swabs, labeled A, B, C, and D, for testing at the Washington State Patrol's Crime Laboratory (WSP crime lab).

Denise Olson, a forensic analyst for the WSP crime lab, tested the four swabs. Her report stated that she used "a standard DNA extraction protocol" in evaluating the swabs. Clerk's Papers (CP) at 274. After extracting DNA from the swabs, she quantified them for human DNA levels and then amplified them. She concluded that one of the swabs contained DNA from Mr. Allen and excluded Mr. Davis. She obtained a "partial DNA typing profile from swab D," which had been taken from the handle of the bat, and concluded the swab was "a mixture of at least two individuals." CP at 275. Her report stated: "The major contributor is an unidentified male, designated Unknown Individual A. . . . Jeramie Davis is excluded as a contributor to this profile." CP at 275.

Mr. Davis was eventually charged with first degree murder for causing Mr. Allen's death. At trial, two witnesses testified that Mr. Davis admitted that he stole some money, checks, and pornography from Mr. Allen's store on the night of the murder. The prosecution argued that the detectives had "ruled out any other suspect" other than Mr. Davis. CP at 76. During closing argument, the prosecution also argued that Mr. Davis hit Mr. Allen "over the head with the baseball bat" and then "clean[ed] out the store." CP at 76. In response to Mr. Davis's argument that DNA on the bat showed someone else was

3

the killer, the prosecution countered that Mr. Davis had worn gloves while inside the store. Mr. Davis was convicted of first degree murder for causing Mr. Allen's death. This court affirmed the conviction in an unpublished decision. *State v. Davis*, noted at 151 Wn. App. 1047, 2009 WL 2480132.

After Mr. Davis's conviction, detectives continued to get information about individuals whose fingerprints matched previously unidentified fingerprints lifted from Mr. Allen's store and truck. In 2011, a Combined DNA Index System (CODIS) search of the "'unknown Individual A'" swab was identified as matching the profile of Mr. Davila. Report of Proceedings (RP) at 290; CP at 4. The State charged Mr. Davila with murder under two different theories: first degree felony murder for working with Mr. Davis to commit a robbery and thereby causing Mr. Allen's death; and, second degree felony murder for causing Mr. Allen's death in the course of an assault or attempted assault in the second degree. During questioning, Mr. Davila denied knowing Mr. Allen or Mr. Davis or having any involvement in the murder.

At trial, State's witnesses carefully detailed the chain of custody of key pieces of evidence. Detective Cestnik, who had become a detective after the Davis trial, testified that Mr. Allen was lying in a pool of blood with magazines next to him. Detective Cestnik stated that he wore gloves when he moved the baseball bat from the floor to

preserve any potential DNA evidence. During cross-examination, Detective Cestnik admitted that he did not place the baseball bat in a paper bag and that the handle of the bat was resting on top of some boxed DVDs.

Detective John Miller testified that he collected evidence from the crime scene. He testified that some of Mr. Allen's relatives arrived during the investigation and informed him that Mr. Allen's truck was missing. Patrol officers later located the truck. The detective directed forensic personnel, Carrie Johnson and Lori Preuninger, to gather fingerprints from inside the truck and store. Fingerprints taken from a counter close to where Mr. Allen was found matched Mr. Davila's.

Detective Timothy Madsen, the lead detective on the case, testified that he investigated the interior of Mr. Allen's store after interviewing Mr. Davis. He removed the baseball bat and had forensic personnel check for latent prints on countertops and items inside the store. He also had forensic technicians swab the steering wheel of Mr. Allen's truck. According to Detective Madsen, Ms. Preuninger swabbed four different areas of the baseball bat. Detective Madsen then submitted those swabs to the WSP crime laboratory. He explained that once the evidence was collected, it was placed in sealed envelopes and then stored in the property room. Detective Madsen testified that he personally took the evidence from the property room to the WSP crime lab for testing.

5

The State did not call Ms. Olson to discuss her initial testing of the evidence. Instead, it called Lorraine Heath, the supervising forensic scientist for the WSP crime lab. Ms. Heath testified that she retested "swab D" from the baseball bat and concluded that the unknown profile matched Mr. Davila's DNA profile. RP at 436-37. Ms. Heath explained the crime lab's contamination prevention procedures and controls. She also testified that she reviewed Ms. Olson's previous testing of sample D and the steering wheel swabs. She explained that due to the low level of DNA from the steering wheel swab, "Julio Davila can be neither included nor excluded as a possible contributor to [the] profile." RP at 446. During cross-examination, defense counsel questioned Ms. Heath about the possibility of a "secondary transfer" of DNA from other sources to the baseball bat, but did not question her about Ms. Olson's original handling of the evidence. RP at 458. Ms. Preuninger, a forensic specialist for the Spokane County Sheriff's Office, swabbed the bat and detailed the precautions to prevent contamination.

After the State rested, Mr. Davila moved to dismiss the charges for insufficient evidence. The trial court dismissed the first degree murder charge, finding there was no evidence that Mr. Davila was an accomplice to the robbery committed by Mr. Davis.

During closing argument, the prosecution emphasized that the investigation and handling of the evidence was meticulous and professional. He reminded the jury that

6

Detective Madsen secured the scene and that everyone wore gloves. The bat was secured in a property room and Ms. Preuninger swabbed the bat in four locations and gave the swabs to Detective Madsen. The prosecutor highlighted "the great care and procedures that [Ms. Preuninger] use[d] to make sure that those swabs [were] not contaminated." RP at 537-38. The State concluded, "Ladies and gentlemen, we know whose DNA that is now. We didn't have Mr. Davila's DNA in the system back when we were initially investigating this crime, but now we know who swung that bat; Julio Davila swung the bat." RP at 543.

The defense's theory was that Mr. Davis killed Mr. Allen. Defense counsel argued that "[t]he evidence pointed directly to [Mr. Davis]" and attributed the absence of DNA and fingerprint evidence to Mr. Davis's use of gloves. RP at 544. The prosecutor responded that what Mr. Davis did was "inexcusable," but "Mr. Davis, according to the evidence, didn't swing the bat." RP at 556. The prosecutor then returned to the strength of the DNA evidence: "Whose DNA was on the bat? Mr. Davila swung the bat." RP at 559. The jury found Mr. Davila guilty of second degree murder.[3]

---

[3] The Spokane County Superior Court vacated Mr. Davis's murder conviction on September 20, 2012, in case number 07-1-02548-8 after Mr. Davila was convicted of Mr. Allen's murder.

Before sentencing, defense counsel learned that Ms. Olson had been fired for poor performance in conducting DNA tests. The defense filed a public disclosure request and obtained a lengthy report from the Washington State Patrol detailing years of Ms. Olson's incompetence and "unsatisfactory performance." CP at 237-60. The February 2011 report, written by Larry Hebert, the director of the WSP's Laboratory Services Bureau, explained that after numerous errors performing DNA tests, Ms. Olson was given a final opportunity to improve her performance under a 90-day job improvement plan, supervised by Ms. Heath, which assessed her performance in 15 "routine and straightforward" cases "for the purpose of assessing her competency." CP at 239.

Even at a time when Ms. Olson was under close scrutiny, she continued to make major and minor mistakes. Five reviewing scientists reviewed the quality of her work. Ms. Heath summarized Ms. Olson's incompetence as including "a lack of attention to detail" and making a "number of technical mistakes," and noted "poor performance and critical work deficiencies prevail despite numerous opportunities to improve." CP at 239-40.

The report also summarized findings from an earlier investigation launched in May 2008, which "arose out of two years of poor evaluation dating back to 2006 and an error in . . . proficiency test." CP at 255. The 2008 audit reviewed 27 of Ms. Olson's

cases of which only 6 did not have errors. This resulted in "*Brady* letters" being sent to 11 prosecuting attorneys notifying them of Ms. Olson's faulty testing. CP at 256. The report documented the following problems: (1) mathematical errors resulting in the amplification of more DNA than intended; (2) diluting the wrong sample, contaminating one sample with a nonadjacent sample, mixing samples; (3) listing the wrong victims, suspects, and case names; (4) incorrectly concluding a suspect's DNA was included in a mixed sample; and (5) other incorrect conclusions. One reviewer noted that Ms. Olson "violated analytical protocol by processing reference samples prior to evidence samples [thereby] increasing risk of contamination." CP at 255.

The report concluded "[Ms. Olson] is a loose cannon and her work cannot be trusted. The work product of the Crime Laboratory Division is too vital to the administration of justice to allow [Ms. Olson] to place her hands on evidence. The risk of a wrongful conviction or the erroneous exclusion of a guilty subject because of [Ms. Olson's] incompetence is far too great for the agency to undertake." CP at 259.

After receiving the report, Mr. Davila moved for a new trial based on the prosecution's failure to disclose this evidence. Defense counsel pointed out that Ms. Heath had never mentioned Ms. Olson when he asked her about the crime lab's testing procedures and safeguards. He argued that the State had an obligation to disclose the

information about Ms. Olson because "she handled all of the DNA evidence in this case. It was in her possession, she maintained it, she tested it." RP at 576-77. Defense counsel also argued that the failure to disclose the information deprived him of the opportunity to challenge the DNA evidence and the possibility of improper handling: "I believe saying that Ms. Heath touched this evidence, looked at it, it all looked fine, that doesn't exclude the fact that it could have been contaminated in some way because of Ms. Olson's poor performance in the past prior to Ms. Heath touching it." RP at 577. The prosecutor responded that he had not been aware of the WSP report, and that it was Ms. Heath, not Ms. Olson, who had conducted all the DNA testing in Mr. Davila's case.

The trial court was not particularly concerned about the contents of the performance report, noting that it focused "more on things like not writing the report very well, and also taking too long and using more of the resources of the crime lab that really ought to be used." RP at 595. The court gave defense counsel time to contact a DNA expert to determine whether there was any basis for concern about the DNA testing.

Defense counsel contacted Dr. Gregory Hampikian, a DNA expert with a PhD in genetics. Dr. Hampikian reviewed the WSP investigative file and noted "[m]ost troubling are the multiple instances where [Ms. Olson] deviated from protocol without reason, and specifically one documented case where she switched samples after careless labeling."

10

CP at 310. After summarizing Ms. Olson's multiple "technical and scientific failures"

during 2006 and 2007, he concluded the errors "demonstrate a clear pattern of

incompetence that [the] report characterizes as damaging to the laboratory's reputation

and the public trust." CP at 310. Dr. Hampikian noted that Ms. Olson performed critical

DNA tests and had access to the key DNA samples used to implicate Mr. Davila. He

stated, "With her well-documented propensity for errors, her work *in this case is suspect.*"

CP at 310 (emphasis added). He continued,

> While I can not determine if . . . Mr. Davila's DNA was in the laboratory at
> the same time (or before) the evidence samples in this case, it is clear that
> two evidence samples in this case (the sample taken from the car, and that
> from the bat) were handled and processed by Ms. Olsen [sic]. If the car
> sample actually had Mr. Davila's DNA, it is possible that Ms. Olsen
> mislabeled or contaminated the samples, so that her finding of Mr. Davila's
> DNA on the bat is incorrect. This . . . concern is based on her well-
> documented, long term deficiencies, and the specific mislabeling of samples
> described in her performance records.

CP at 310-11.

The trial court denied Mr. Davila's motion for a new trial, finding that the

existence of other crime scene items with the baseball bat in the lab did not mean they

"were in proximity at a time and a place where contamination could have occurred."

RP at 619. The court pointed out that the testing of the DNA from the steering wheel and

the baseball bat had been conducted on different days and, therefore, there was no risk of

11

contamination. It stated:

> We do know that Mr. Davila's DNA was not in the lab directly from any prior conviction or prior matter, so the test sample for him came in later. Ms. Heath has provided not only her certificate of where she tested the materials, but also the reports that these materials were not tested together. They were tested on separate days.
>
> The first thing that was tested was the bat, and it is the bat that has the DNA. The steering wheel ended up being inconclusive as to whether or not Mr. Davila's DNA was even on it. So that was inclusive; it has never been identified specifically as an item that had his DNA.

RP at 623. The court ultimately concluded that the risk of contamination was purely speculative and, therefore, Ms. Olson's history of incompetence was not material to Mr. Davila's case. Mr. Davila appeals.

## ANALYSIS

### I. Brady *Violation*

Mr. Davila first asserts the trial court erred in denying his motion for a new trial because the State failed to disclose favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). An asserted *Brady* violation, which implicates due process concerns, is reviewed de novo. *State v. Autrey*, 136 Wn. App. 460, 467, 150 P.3d 580 (2006).

The prosecution has an affirmative duty to disclose evidence favorable to a defendant. *Brady*, 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555,

131 L. Ed. 2d 490 (1995). In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. The prosecutor's good or bad faith is unimportant. Significantly in this case, "a prosecutor has the duty to learn of evidence favorable to the defendant that is known to others acting on behalf of the government in a particular case, including the police." *In re the Pers. Restraint of Brennan*, 117 Wn. App. 797, 804, 72 P.3d 182 (2003) (citing *Kyles*, 514 U.S. at 437). The purpose of holding police and those helping police accountable is that "'[e]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it.'" *Id.* at 804-05 (quoting *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995)). Without this rule, "prosecutors could instruct those assisting them not to give the prosecutor certain types of information, resulting in police and other investigating agencies acting as the final arbiters of justice." *Id.* at 805.

Before there is a constitutional violation under *Brady*, three elements must be satisfied: (1) the State failed to disclose evidence that is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the undisclosed evidence was prejudicial. *State v. Mullen*, 171 Wn.2d 881, 895, 259 P.3d 158 (2011) (quoting *Strickler*

13

*v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). In analyzing these factors, we are mindful that the fundamental purpose of *Brady* is the preservation of a fair trial. *Id.* (quoting *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006)).

A. *Favorable to the Accused.* The prosecution's duty to disclose impeachment evidence is well established. "'Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness.'" *United States v. Jackson*, 345 F.3d 59, 70 (2d Cir. 2003) (quoting *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). Mr. Davila contends the withheld information was significant impeachment evidence that would have substantially benefitted his defense. He argues, "[d]ue to the prospect of contamination or false results, Ms. Olson's conduct would have been pertinent, favorable evidence that should have been disclosed." Br. of Appellant at 21. He contends that had he known about the WSP report detailing Ms. Olson's incompetence, he could have impeached Ms. Heath's assertions about the lab's careful attention to protocol and proficiency testing.

The State, however, asks us to measure the value of the potential impeachment evidence based on Mr. Davila's failure to call Ms. Olson as a witness, and argues that "[t]he fact that Ms. Olson's work did not identify Mr. Davila as being at the scene of the murder worked to Mr. Davila's advantage, so he would have no reason to impeach her

14

No. 31238-1-III
*State v. Davila*

work." Br. of Resp't at 7.

The State's argument overlooks the fact that Mr. Davila had no reason to believe Ms. Olson was a significant witness until he learned of her incompetence and resulting termination from the crime lab. At the time of trial, the defense did not know that Ms. Olson had lost her job due to repeated instances of failing to follow laboratory protocol. It did not know that she had contaminated DNA samples. If this information had been disclosed, defense counsel could have used the information to cross-examine Ms. Heath about the reliability of the DNA testing and undermine the professionalism of the State's forensic witnesses. Our Supreme Court has emphasized the importance of this cross-examination, noting, "[t]he United States Supreme Court has recognized the potential value in cross-examining forensic analysts." *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 489, 276 P.3d 286, *cert. denied*, 133 S. Ct. 444, 184 L. Ed. 2d 288 (2012).

Due to the prospect of contamination or false results, Ms. Olson's extensive history of poor performance and incompetence would have been favorable evidence that should have been disclosed. This evidence would have opened an area of impeachment which Mr. Davila was unaware of at the time of trial. As such, it constitutes evidence that was favorable to him on the issue of guilt.

15

B. *Evidence was Suppressed.* We next address whether the State failed to disclose

the favorable evidence, rendering it "suppressed" under *Brady*. *Benn v. Lambert*, 283

F.3d 1040, 1053 (9th Cir. 2002) (the terms "suppression" and "failure to disclose" have

the same meaning for *Brady* purposes). Mr. Davila contends that knowledge of the WSP

report should be imputed to the prosecution because the information was known to the

WSP as authors of the report, and to Ms. Heath, Ms. Olson's direct supervisor. As

explained above, under *Brady*, due process requires the State to disclose to the defendant

any evidence in its possession that is favorable to the defendant, regardless of the good

faith or bad faith of the State. *Brady*, 373 U.S. at 87. "[A]n inadvertent nondisclosure

has the same impact on the fairness of the proceedings as deliberate concealment."

*Strickler*, 527 U.S. at 288. As such, the State "has a duty to learn of any favorable

evidence known to the others acting on the government's behalf in the case" and disclose

that information to the defendant. *Kyles*, 514 U.S. at 437. Therefore, the prosecutor's

lack of awareness of exculpatory evidence in the government's hands is not determinative

of the prosecutor's disclosure obligations. Rather, *Brady* requires disclosure of

information in the government's possession or knowledge, whether actual or constructive.

*United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999); *Brennan*, 117 Wn. App. at

804. Because the prosecution is in a unique position to obtain information known to other

investigating agents of the government, it may not be excused from disclosing what it does not know, but could have learned. *Kyles*, 514 U.S. at 438-40; *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997). Thus, a prosecutor's duty to learn of favorable evidence has been interpreted broadly because of a "special status" within the American criminal justice system. *Strickler*, 527 U.S. at 281. "The disclosure obligation exists . . . not to police the good faith of prosecutors, but to ensure the accuracy and fairness of trial by requiring the adversarial testing of all available evidence bearing on guilt or innocence." *Carriger*, 132 F.3d at 480.

With these principles in mind, we determine that the prosecution was in constructive possession of the WSP report and Ms. Olson's history of incompetence. An audit conducted close in time to the *Davis* prosecution resulted in *Brady* letters being sent to 11 prosecuting attorneys notifying them of Ms. Olson's problems and the potential impact on their cases. Moreover, the information was known to the WSP, which supports criminal investigations by gathering evidence for law enforcement agencies. *State v. Gregory*, 158 Wn.2d 759, 829 n.37, 147 P.3d 1201 (2006). The WSP crime lab's director wrote the report, which was issued more than one year before Mr. Davila's trial, and Ms. Heath, who was Ms. Olson's immediate supervisor, devised Ms. Olson's job improvement plan. Given that Ms. Heath was acting on behalf of the State as a primary

17

witness at trial, her knowledge of the WSP report must be imputed to the prosecutor. The State cannot avoid *Brady* "by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984). In fact, a "prosecutor may have a duty to search files maintained by other governmental agencies closely aligned with the prosecution when there is some reasonable prospect or notice of finding exculpatory evidence." *United States v. Harmon*, 871 F. Supp. 2d 1125, 1154 (D.N.M. 2012), *aff'd*, 742 F.3d 451 (10th Cir. 2014) (internal quotation marks omitted).

We conclude that the prosecutor had constructive possession of the information and, therefore, wrongfully suppressed it.

C. *Materiality.* The remaining and most significant issue is whether the WSP report was material, i.e., whether its nondisclosure prejudiced Mr. Davila. As detailed above, the trial court denied the motion for a new trial, concluding the report was not material to Mr. Davila's case without some evidence that the DNA sample had been contaminated. It dismissed the defense's concerns of contamination as speculative, pointing out that the two key pieces of evidence—the steering wheel and the baseball bat—were tested on different days.

18

Mr. Davila contends the State's failure to disclose the report undermines confidence in the outcome of the trial because he was not able to conduct meaningful cross-examination of Ms. Heath and thereby challenge the critical DNA evidence. He maintains: "[h]ad the jury known that the swabs taken from the bat's handle, which formed the only potentially direct connection between the incident in which Mr. Allen was killed and Mr. Davila, had been handled, processed, and tested by a forensic scientist whose work 'cannot be trusted' due to her 'long term poor performance,' the jury would have thought differently about the value of the DNA evidence." Br. of Appellant at 28.

Prejudice, also referred to as "materiality," is established when there is a reasonable probability that had the prosecution disclosed the evidence to the defense, the proceeding would have had a different result. *State v. Thomas*, 150 Wn.2d 821, 850, 83 P.3d 970 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)); *Kyles*, 514 U.S. at 433. The *Kyles* court elaborated:

> [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

19

*Kyles*, 514 U.S. at 434.

Thus, materiality is not a sufficiency of the evidence test. *Id.* A defendant does not lose on a *Brady* claim where there still would have been adequate evidence to convict even if the favorable evidence at issue had been disclosed. *Id.* at 435. In assessing the materiality of undisclosed evidence, a court must consider "any adverse effect that the prosecutor's failure [to disclose the evidence] might have had on the preparation or presentation of the defendant's case . . . with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken" had the information been disclosed to the defense. *Bagley*, 473 U.S. at 683.

We start our analysis by noting that the DNA evidence was the crux of the State's case, and that Ms. Olson was the critical link in the chain that handled the DNA swabs and performed the initial testing. Disclosure of the report would have led to additional investigation that could have been vital to the defense. In challenging the DNA evidence, the defense could have called Dr. Hampikian, who according to defense counsel, had concerns about the fact that two days before the baseball bat was tested, swabs from Mr. Allen's truck and the steering wheel were in the lab, raising the possibility of contamination of the evidence. Dr. Hampikian expressed serious concerns about Ms. Olson's access to the DNA samples and found her work in the case "suspect." CP at 310.

He could have explained the importance of following DNA protocols and the risk of contamination presented by Ms. Olson's conduct.

In view of the foregoing, the fundamental question is whether there is a reasonable probability that disclosure of the suppressed evidence would have led to a different result, i.e., whether in the absence of disclosure, Mr. Davila received a fair trial resulting in a verdict worthy of confidence. The omission is evaluated in the context of the entire record. *United State v. Agurs*, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). While Ms. Olson's incompetence is undisputed, close review of the record establishes little likelihood that her handling of the evidence could have contaminated the evidence at issue. As detailed above, the State carefully established the chain of custody and the care taken by each person in that chain to secure uncontaminated DNA samples. Each person in that chain testified about his or her role in the process. Detective Cestnik testified that he wore gloves when he placed the baseball bat on the shelf in Mr. Allen's store. Detective Madsen removed the baseball bat from Mr. Allen's store and Ms. Preuninger swabbed the bat. Ms. Preuninger detailed the precautions she utilized to prevent contamination. Detective Madsen personally submitted the swabs to the WSP crime laboratory where they were placed in sealed envelopes and then stored in the property room. Ms. Olson's reports show that she tested the DNA swabs from the

21

steering wheel and the baseball bat on separate days, astronomically reducing the possibility of cross contamination.

Admittedly, Ms. Olson's incompetence raises general concerns about the adequacy of the DNA testing. Nevertheless, there is no evidence that Ms. Olson tampered with or mishandled the evidence in this particular case. At most, Mr. Davila has established that Ms. Olson was fired from her job for incompetence related to other testing, but nothing in the record shows that her incompetence compromised the evidence at issue here. Ms. Heath peer reviewed Ms. Olson's work and found no evidence of protocol violations. While evidence of Ms. Olson's incompetence could have been used for impeachment purposes, it was not material to the accuracy of Ms. Olson's work in this case. Based on the paucity of evidence that contamination actually occurred in this case, we conclude that the defendant received a fair trial resulting in a verdict worthy of confidence. Therefore, the State's suppression of the WSP performance report did not violate *Brady*.

## II. *Prosecutorial Misconduct*

Finally, Mr. Davila contends that the prosecution engaged in misconduct by using inconsistent theories of criminal culpability: arguing at Mr. Davis's trial that Mr. Davis "hit [] Mr. Allen over the head with the baseball bat," but at the subsequent trial that Mr. Davila was the person who killed Mr. Allen with the baseball bat. CP at 76. He argues,

22

"both men could not be guilty of being the person who killed Mr. Allen. . . . Either Mr. Davis hit Mr. Allen on the head, as the State argued at Mr. Davis's trial, or Mr. Davila did so, but there was no evidence that both did so together." Br. of Appellant at 35.

A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). Once a defendant establishes that a prosecutor's statements are improper, this court determines whether the defendant was prejudiced under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant objected at trial, he must show that the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. *Id.* If the defendant did not object, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *Id.* at 760-61.

The use of inconsistent theories to obtain convictions against separate defendants in prosecutions for the same crime violates the due process clause if the prosecutor uses false evidence or acts in bad faith. *Nguyen v. Lindsey*, 232 F.3d 1236, 1240 (9th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045, 1058 (9th Cir. 1997), *vacated on other grounds*, 523 U.S. 538, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998). However,

23

inconsistent theories are permitted, if, between the two trials, new evidence comes to light

that supports the second theory. *See Thompson*, 120 F.3d at 1058.

In denying Mr. Davila's motion for a new trial based on the prosecutor's use of

inconsistent theories, the trial court first noted that both parties mentioned Mr. Davis's

conviction at trial:

> It was clear from day one on this trial that the jury was going to hear
> information about Mr. Davis and that Mr. Davis had been convicted of the
> murder. That issue came up specifically via motion that the defense made
> early on to call Mr. Nagy [the prosecutor in the *Davis* trial] as a witness. I
> denied that motion. We were aware, and I know I said something to that
> effect, that the jury was going to be hearing about Mr. Davis. They
> certainly did hear about Mr. Davis from both sides. The fact that Mr. Davis
> was convicted is a fact in this case and it is a fact that was given to the jury.
> Not discussing it would have appeared odd to the jurors since it was the
> subject of closing on both sides, the defense as well as the state. I do not
> believe that the prosecutor's remarks were inappropriate.

RP at 589-90.

The court also noted that new evidence surfaced after the *Davis* trial and that the

State's theories at the two trials were not inconsistent:

> At the time that Mr. Davis was tried, there was an identification of
> another individual referred to as unknown individual A, who had DNA on
> the baseball bat. There was no match to Mr. Davila at the time. The jury in
> the *Davis* case was aware of that fact and it was mentioned in the closing
> argument.
> When we come to this case, really the theory of this case is no
> different than the theory in the *Davis* case. Mr. Allen was killed by a
> baseball bat, that remained the same. There was unknown individual A's

24

DNA on the baseball bat . . . . Those issues did not change.
. . . This is not a situation where the theory in this case has been changed. There is additional information that was available in the Davila case that was not available in the *Davis* case, i.e. now the unknown individual A is Mr. Davila.

RP at 590-92.

In closing, the State argued, "[y]ou heard a lot about Mr. Jeramie Davis. Mr. Davis isn't what we're here about. You're here about Mr. Davila. Mr. Davis has already been convicted for what he did on that day. We're not here to reconvict Mr. Davis all over again. His case is done." RP at 543. The prosecutor then noted that the State did not have Mr. Davila's DNA in the system when the murder was first investigated, but "now we know who swung the bat; Julio Davila swung the bat." RP at 543.

The State's theories were not inconsistent. The State always maintained that Mr. Allen was killed with the baseball bat. As to who held the bat, it is true that the prosecutor made different arguments at each trial, but his argument at the second trial was consistent with the new evidence that came to light after the first trial. *Nguyen*, 232 F.3d at 1240. This is not prosecutorial misconduct.

Mr. Davila fails to establish prosecutorial misconduct. In the absence of a finding of prosecutorial misconduct, Mr. Davila's cumulative error argument likewise fails. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

No. 31238-1-III
*State v. Davila*

We affirm.

_____
Lawrence-Berrey, J.

_____
Brown, J.

_____
Siddoway, C.J.

26