# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 60505-8-II |
| ALEX LOPEZ LEON, | UNPUBLISHED OPINION |
| Petitioner. | |

PRICE, J. — In this personal restraint petition (PRP), Alex Lopez Leon seeks relief from restraint following his convictions for one count of first degree murder and one count of second degree murder (both with firearms enhancements). Lopez Leon alleges that his restraint is unlawful because (1) the State violated due process by arguing a theory of the case that was inconsistent with his codefendant's guilty plea, and (2) he received ineffective assistance of counsel at sentencing when defense counsel failed to adequately argue for the trial court to impose a lesser sentence. We disagree and deny Lopez Leon's petition.

FACTS

I. BACKGROUND

On May 14, 2018, a car was discovered in a residential neighborhood with two bodies inside. The two men, later identified as Adrian Valencia Cuevas and Wilberth Lopez Acala, had both died from gunshots to the head. Law enforcement focused their investigation on two suspects,

Alex Lopez Leon and Javier Valenzuela Felix, who left a party with Wilberth and Adrian on the night of the murders.[1]

Lopez Leon and Javier were eventually charged as codefendants with two counts of second degree murder (with firearms enhancements) for the deaths of Adrian and Wilberth.[2] Lopez Leon was charged as either a principal or an accomplice to the murders, whereas Javier was charged only as a principal. After further investigation, the State amended the charges related to Wilberth's death to first degree murder.

Javier eventually agreed to plead guilty in July 2019. As part of the plea agreement, the State amended Javier's information to the original charges of two counts of second degree murder with firearm enhancements. In an addendum to his written statement of defendant on plea of guilty, Javier said that he was the person who shot both Adrian and Wilberth:

> "On May 14, 2018, in Pierce County, Washington, with the intent to cause the deaths of Adrian Valencia Cuevas and Wilberth Lopez Acala, human beings, *I did unlawfully cause their deaths when I shot them with a firearm*. Earlier that day, Adrian Valencia Cuevas, Wilberth Lopez Acala, Alex Lopez Leon and I had been at a barbecue drinking beer when the four of us decided to go for a drive. Wilberth Lopez Acala drove the car and Adrian Valencia Cuevas was the right front seat passenger, Alex Lopez Leon was the right rear passenger. And I was the left rear passenger. The murders took place during the drive."

---

[1] Adrian, Wilberth, and the codefendant, Javier Valenzuela Felix, all have two surnames. The references to the individuals are inconsistent in the record, and the record does not reflect their naming preferences. We refer to them using their first names to avoid confusion. No disrespect is intended.

[2] A more complete recitation of the background facts is included in this court's opinion from the direct appeal, *State v. Lopez Leon*, No. 56467-0-II, slip op. (Wash. Ct. App. Aug. 21, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056467-0-II%20Unpublished%20Opinion.pdf.

Br. of Resp't, App. at 24 (emphasis added) (quoting Plea Form Addendum ¶ 11). Javier's guilty plea was accepted, and on July 31, 2019, he was sentenced to 366 months in prison.

Meanwhile, the case against Lopez Leon continued. In July 2021, two years after Javier pleaded guilty, the State amended Lopez Leon's information again to charge two counts of first degree murder.

Lopez Leon's jury trial began that same month. Many of the facts elicited at trial mirrored Javier's written plea statement. The night of the murders, Lopez Leon and Javier left a party with Wilberth and Adrian. And at some point during the drive, Wilberth and Adrian were both shot a short range from behind, with the shooter being positioned in the center of the rear seats.

But the trial testimony also provided additional details, unknown at the time of Javier's guilty plea. For example, a ballistics expert testified that based on a comparison of one of the bullets and ammunition cartridges recovered from the scene, it was possible that two different guns were used for the murders.

Trial testimony also revealed additional information about Lopez Leon and Javier's conduct both before and after the murders. Text messages showed that Lopez Leon, who had not previously known Adrian, had apparently tried to lure Adrian to the party in the hours before the murder by repeatedly asking Adrian's brother about Adrian's whereabouts and if Adrian could join them at the party.

And video footage also showed that Lopez Leon made no attempt to separate from Javier after the murders. The footage showed both men walking away from the car together before beginning to jog. Three hours later, the two men were seen together boarding a bus after having switched clothing. And in the days following the murders, Lopez Leon continued to contact Javier,

exchanging texts about drug deals, law enforcement's investigation into the murders, as well as other, more mundane topics.

Relevant to this PRP, the trial culminated in a closing argument, during which the State argued a theory that was inconsistent with Javier's earlier admission that he personally shot both men.

## II.  CLOSING ARGUMENTS

The State began its closing argument by reminding the jury of the context of the alleged murders:

> There was one plan in place when four people got into [the] Dodge Charger on May 14th, 2018.  One plan that ran its course; one plan that was fulfilled.  That plan? The murder of Adrian Valencia Cuevas and the murder of Wilberth Lopez Alcala. And the State has proved beyond a reasonable doubt that Javier Valenzuela Felix and the defendant, Alex Lopez Leon, were premeditated in their purpose, premeditated in their target, and premeditated in their results.

16 Verbatim Rep. of Proc. (VRP) (Sept. 8, 2021) at 1768.

The State then argued, based on the trial evidence, that although Javier had killed Adrian first, Lopez Leon had pulled the trigger to kill Wilberth.  The State explained,

> Wilberth, based on the video that we have, and based on the presence of everyone in the vehicle, had just seen someone murdered.  Can they rely on him to keep quiet?  Can they be sure that he won't go to the police? . . .
>
> No, Wilberth cannot be trusted.  He's too much of a risk to leave alive.  He's got to be kept quiet; so he has to die too.  And during those 17 minutes, based on reasonable inferences that you can make from the evidence, at some point, the decision is made to kill Wilberth. . . .
>
> But this time, the evidence shows that [Lopez Leon] is the one who pulled the trigger. . . .
>
> [Lopez Leon] leans forward, possibly with the nine-millimeter he was looking for, and fires a nine-millimeter round into Wilberth's head.

4

16 VRP at 1797-98. The State then went on to explain how the jury could infer that Lopez Leon was the one who had shot Wilberth:

> So how is it the State [is] able to say these things? Well, we know from the evidence the trajectory of the bullet is from right to left, meaning that whoever pulled the trigger shot Wilberth from the right side of his head with the bullet exiting to the left in his forehead. . . .
>
> . . . .
>
> So is it more consistent, with the trajectory of the bullet, that it was [Javier] sitting directly behind Wilberth to shoot him from the right using a different caliber gun? Because remember, [the ballistics expert] testified that it was more consistent with a .380 bullet that killed Adrian. So now there's a bullet that is most likely a nine-millimeter because of all of the shell casings present. Would [Javier] change guns to shoot the second person? That doesn't make a lot of sense.

16 VRP at 1798-1800.

Following closing arguments, the jury found Lopez Leon guilty, as a principal or as an accomplice, of first degree murder for the death of Wilberth and second degree murder for the death of Adrian, both counts with firearm sentencing enhancements.

III. SENTENCING

Defense counsel requested a sentence at the low-end of the standard range. They asked the trial court to take into account Lopez Leon's limited criminal history and his "youthfulness" given that, at the time of the murders, Lopez Leon was a little over 21 years old. VRP (Nov. 19, 2021) at 13. Defense counsel also attached a psychological evaluation that explained Lopez Leon's "relevant social and clinical history." CP at 164.

Although defense counsel had asked for only a low-end sentence, the State, citing "the *Monschke* line of cases,"[3] addressed whether a youthful offender could receive an exceptional

---

[3] *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021)(plurality).

5

sentence *below* the standard range. VRP (Nov. 19, 2021) at 6. Acknowledging the fluidity of the

case law, the State argued that given the circumstances of the case, Lopez Leon's youthfulness did

not warrant an exceptional downward sentence:

> At the time of this offense the Defendant was 21 years and 130 days old. So he is just outside of the 19- and 20-year-old range for being entitled to an exceptional sentence below the standard range because of his status as a youthful offender. However, it's my understanding—and I didn't mention this in the sentencing memorandum, but it's my understanding that there is actually a case pending before the Supreme Court at this time asking the Court to essentially expand *Monschke* to offender score of 21 years old.
>
> The Defendant would qualify I believe if he was 21 years and 130 days old at the time of this particular offense. So in an abundance of caution, the State did conduct an analysis of whether or not the Defendant would qualify or should be entitled to an exceptional sentence below the standard range in addressing whether or not his youthfulness affected his capacity to understand the wrongfulness of his crimes.

VRP (Nov. 19, 2021) at 6-7. The State explained that the trial court should not "find that the

Defendant's youth contributed to his offense" because of his criminal history, his ability to be "a

productive member of society" prior to these murders, and his "behavior both before, during, and

after the incident [which] clearly indicated . . . a cold, calculating, and methodical individual."

VRP (Nov. 19, 2021) at 7-8.

After the State finished its argument, defense counsel reiterated their request for a low-end

sentence. They also referenced the on-going developments in case law regarding the impact of

youthfulness on criminal behavior:

> Youthfulness, there's been a lot of cases that have come before and we still have more cases coming, Your Honor. I think the one that we're more familiar with is the [*Houston-Sconiers*[4]] which came out of this particular courthouse which says that the Court has to take into consideration one's youthfulness. I did write in my sentencing memo that we attached Dr. Carlson's relevant social and clinical history

---

[4] *State v. Houston-Sconiers*, 188 Wn.2d 1, 19, 391 P.3d 409 (2017).

so [] that [the] Court can take that into consideration when evaluating his youthfulness.

VRP (Nov. 19, 2021) at 13-14.

The defense went on to ask the trial court to take into account the details of Lopez Leon's sentencing memorandum including his "background in Mexico," his "struggles," and the support he provided for his family. VRP (Nov. 19, 2021) at 15. Defense counsel did not reference any other specific cases regarding the trial court's authority to consider youthfulness.

In his allocution, Lopez Leon apologized to the family of the victims but stopped short of admitting to the crimes.

> I think I owe to everyone in this courtroom and especially the family an apology, and I really don't have any words to explain everything. I didn't know how to stop it or how to handle the situation; so I'm sorry. So—it was terrible. It was a tragedy, and I just hope that everybody knows that I'm really, really sorry. I didn't have an option. I was just there. Whatever I did it was just because I wanted to preserve my life to survive. So I'm sorry. Thank you.

VRP (Nov. 19, 2021) at 15-16.

The trial court rejected not only an exceptional sentence based on youthfulness, but also defense counsel's request for a low-end standard range sentence. The trial court reasoned that even taking into account Lopez Leon's youth, life experiences, and social history, a low-end sentence still was not justified given that Lopez Leon's participation in the murders had been "deliberate," "confident," and "calculated." VRP (Nov. 19, 2021) at 18.

While neither party argued for Lopez Leon's sentences or firearm enhancements to be run concurrently, the trial court stated that it lacked the discretion to run sentences for serious violent offenses concurrently unless they were done in the same course of conduct. Because Lopez Leon was being sentenced for first and second degree murder, two serious violent offenses, both with

firearm sentencing enhancements, the trial court said that they "must be served consecutively." VRP (Nov. 19, 2021) at 19.

The trial court imposed a mid-range sentence of 327 months for his first degree murder conviction and 207 months for his second degree murder conviction (both including the firearms sentencing enhancements) run consecutively for a total of 534 months of confinement.

## IV. DIRECT APPEAL

On direct appeal, among other issues, Lopez Leon argued that "the trial court erred by failing to recognize its discretion to impose an exceptional sentence." *State v. Lopez Leon*, No. 56467-0-II, slip op. at 49 (Wash. Ct. App. Aug. 21, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056467-0-II%20Unpublished%20Opinion.pdf.

In addressing Lopez Leon's arguments, we first assessed whether "the trial court incorrectly believed it lacked discretion to impose a mitigated exceptional sentence." *Id.* at 51. We held that while it was "clear" that the trial court had understood its ability to impose an exceptional sentence based on youthfulness, the trial court had mistakenly believed that "the legislature had removed its discretion to run concurrent sentences for violent offenses." *Id.* at 51-52.

Because the trial court had misunderstood its ability to run Lopez Leon's sentences concurrently, we next looked at whether there was a possibility that the trial court would have imposed a mitigated exceptional sentence if it had known about its ability to do so. *Id.* at 53. We held that the record showed no such possibility, explaining,

> [T]here is no reasonable possibility that the trial court would have imposed an exceptional sentence downward by running the sentences concurrently even if it had understood its discretion to do so. Already aware of its discretion to impose an

exceptional sentence based on Lopez Leon's youthfulness, the trial court refused, characterizing Lopez Leon's behavior as "deliberate, it was confident, and it was calculated." VRP (Nov. 19, 2021) at 18. The record is utterly devoid of any hint that the trial court would have made a different decision if it [had] understood there was a separate statutory route to impose a sentence under the standard range. Indeed, the trial court imposed a sentence above the low-end is a strong indication that the trial court had no desire to impose an exceptional sentence.

*Id.* Accordingly, we declined to remand for resentencing.

Lopez Leon filed this timely PRP.

ANALYSIS

Lopez Leon seeks collateral relief based on two arguments. First, Lopez Leon argues that the prosecutor violated due process when they shifted their theory from Javier, alone, being the shooter of both men to Lopez Leon being the shooter that killed Wilberth. Second, Lopez Leon argues that he received ineffective assistance of counsel at sentencing because his defense counsel failed to argue for a mitigated exceptional sentence even though there were grounds to do so.

A personal restraint petition is a collateral attack made on a final judgment or sentence in a criminal case that resulted in the petitioner's limited freedom, confinement, or "some other disability." RAP 16.4(b). "[C]ollateral attacks on convictions made through a PRP are allowed only in 'extraordinary' circumstances." *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 12, 513 P.3d 769 (2022) (quoting *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)). Petitioners must overcome a high burden " 'before this court will disturb a settled judgment.' " *Id.* (quoting *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 15, 409 P.3d 214 (2018)

To obtain relief in a personal restraint petition based on a constitutional error, the petitioner must show not only that the alleged error occurred, but also that the error resulted in actual and substantial prejudice. *In re the Pers. Restraint of Skone*, 30 Wn. App. 2d 1, 43, 543 P.3d 842

(2024). To meet their burden, "the petitioner must state with particularity facts that, if proven, would entitle the petitioner to relief." *In re Pers. Restraint of Perry*, 29 Wn. App. 2d 734, 752-53, 542 P.3d 168 (2024). Bald assertions, conclusory arguments, or arguments made in only broad, general terms are insufficient. *Id.* at 753.

I. DUE PROCESS VIOLATION BY STATE

Lopez Leon first argues that the State violated his due process rights when the prosecutor advanced theories of their case that were inconsistent with Javier's admissions in his guilty plea. We disagree.

A prosecutor violates due process if they, while acting in bad faith or using false evidence, argue "inconsistent theories to obtain convictions against separate defendants in prosecutions for the same crime." *State v. Davila*, 183 Wn. App. 154, 174, 333 P.3d 459 (2014), *aff'd on other grounds*, 184 Wn.2d 55, 357 P.3d 636 (2015). However, if the two cases are separated by time and if new evidence is discovered that supports a different theory, then the State is not prohibited from adjusting its position to conform to the new evidence. *Id.*

Here, Lopez Leon argues that the State improperly shifted its theory after Javier pleaded guilty. Invoking evidentiary rules regarding the adoptive admissions exception to hearsay, Lopez Leon contends that by accepting Javier's plea under the theory that Javier (and only Javier) shot both victims, the State was barred from arguing that Lopez Leon had actually been the one to shoot Wilberth.

The State responds that its decision to change its theory was not "bad faith"; rather, it was merely the product of the ongoing investigation, especially the new ballistics evidence discovered after Javier's guilty plea. The State points out that it was not until months after Javier's July 2019

plea that the State learned from its ballistics expert that two different guns may have been involved in the murders. The State further argues that the evidentiary rules regarding adoptive admissions have no bearing on the State's ability to conform its theory to new evidence.

We agree with the State. First, Lopez Leon cannot show actual and substantial prejudice. From the filing of the initial information, the State maintained that Lopez Leon was liable either as a principal or an accomplice. And, as pointed out by the State, "[b]ased on accomplice liability, the jury was not required to determine who fired the shots that killed the victims." Br. of Resp't at 27.

But even setting that aside, Javier's guilty plea occurred three years before Lopez Leon's trial. To lock the State into its theories before it had received additional information from further investigation or discovery is not only inconsistent with current law, but it is also impractical given the realities of trial preparation. *See Davila*, 183 Wn. App. at 174-75 (holding that it is not improper for the State to argue inconsistent theories if the new theory is based off of recently discovered evidence that was not available at the first trial). Without any argument or evidence that the State's change in theory was in bad faith or based on false evidence, Lopez Leon cannot show the prosecutor's arguments were improper.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Lopez Leon also argues that he received ineffective assistance of counsel because his defense counsel (1) failed to request a mitigated exceptional sentence based on his youthfulness and (2) "failed to cite controlling precedent that [his] serious violent offenses and firearm enhancements could be run concurrently." Suppl. Br. of Pet'r at 20-21. We disagree.

Both the United States Constitution and the Washington Constitution guarantee the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. In the context of a PRP alleging ineffective assistance of counsel, a petitioner who demonstrates ineffective assistance of counsel necessarily shows actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 843, 280 P.3d 1102 (2012).

To prevail on an ineffective assistance of counsel claim, the petitioner must show that counsel's performance was deficient and that the deficient performance resulted in prejudice. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). An ineffective assistance of counsel claim fails if the petitioner fails to satisfy either prong of the inquiry. *In re Crace*, 174 Wn.2d at 847. We need not consider both prongs if the petitioner fails to satisfy one. *Id.*

"Performance is 'deficient' if 'it [falls] below an objective standard of reasonableness.' " *Bertrand*, 3 Wn.3d at 128 (alteration in original) (quoting *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995)). We engage in a strong presumption that counsel's performance was reasonable. *Id.* "Defense counsel's performance is not deficient if it is a 'legitimate trial strategy or tactic[ ].' " *Id.* (alteration in original) (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)). It is also not deficient for defense counsel to elect not to raise arguments that are novel or are not likely to be successful. *See State v. Clark*, 17 Wn. App. 2d 794, 799, 487 P.3d 549 (2021) (holding that defense counsel's decision not to request venue change based on defendant's novel theory was a tactical choice and could not be deficient performance), *review denied*, 198 Wn.2d 1033 (2022). The relevant question is whether defense counsel's strategic choices were reasonable. *State v. Fields*, 31 Wn. App. 2d 687, 704, 553 P.3d 71 (2024) (explaining

that a defendant must show that their attorney's conduct was "unreasonable under prevailing professional norms").

A. CONSIDERATION OF YOUTHFULNESS

Lopez Leon first argues that his defense counsel was deficient when they failed to request a mitigated exceptional sentence based on his youthfulness. We disagree.

In *Miller v. Alabama*, the United States Supreme Court held that a mandatory sentence of life without parole for individuals under 18 violated the Eighth Amendment's prohibition of cruel and unusual punishment. 567 U.S. 460, 479, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The decision stressed the importance of the differences between youth and adult offenders, including the effects of brain development. *State v. Houston-Sconiers*, 188 Wn.2d 1, 19, 391 P.3d 409 (2017). Our Supreme Court later expanded *Miller* in *State v. Houston-Sconiers* and mandated that trial courts consider the "mitigating qualities of youth" when sentencing juveniles.[5] *Id.* at 21.

---

[5] When applicable, *Houston-Sconiers* factors that the trial court must consider are:

> "1. [M]itigating circumstances related to the defendant's youth—including age and its 'hallmark features,' such as the juvenile's 'immaturity, impetuosity, and failure to appreciate risks and consequences.' "

> 2. "[F]actors like the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, and 'the way familial and peer pressures may have affected him [or her].' "

> 3. "[H]ow youth impacted any legal defense, along with any factors suggesting that the child might be successfully rehabilitated."

*In re Pers. Restraint of Marshall*, 10 Wn. App. 2d 626, 634-35, 455 P.3d 1163 (2019) (alterations in original) (quoting *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477)). These factors have been called "the mitigating qualities of youth." *See, e.g., id.* at 630 ("Our Supreme Court in *Houston-Sconiers* stated that the Eighth Amendment . . . *requires* sentencing courts to consider mitigating qualities of youth when sentencing juvenile offenders."); *Houston-Sconiers*, 188 Wn.2d at 21 ("Trial courts must consider mitigating qualities of youth at sentencing . . . .").

Subsequent Washington cases have somewhat expanded the underlying principles of *Houston-Sconiers* to young adults. For example, in *Monschke*, our Supreme Court held that 18 to 20 year-old defendants convicted of aggravated first degree murder could not be automatically sentenced to life without parole (LWOP) without allowing trial courts to use their discretion to consider potential mitigating characteristics (such as youthfulness). *Kennedy*, 200 Wn.2d at 24.[6]

More generally, defendants 18 years and older may request the trial court to consider youthfulness as a mitigating factor at sentencing. *State v. Nevarez*, 24 Wn. App. 2d 56, 61-62, 519 P.2d 252 (2022), *review denied*, 1 Wn.3d 1005 (2023). But the requirements are different for older defendants. A trial court must, when asked by the defendant, consider "youthfulness," but it is not required to initiate this consideration on its own, nor is it required to explicitly go through each of the "mitigating qualities of youth" as outlined in *Houston-Sconiers* like it must for a juvenile. *Id.* at 61 ("When sentencing an adult defendant . . . trial courts are merely '*allowed* to consider youth as a mitigating factor.' " (quoting *State v. O'Dell*, 183 Wn.2d 680, 696, 358 P.3d 359 (2015))); *see also State v. Ellis*, __Wn.3d__, 579 P.3d 37, 42-43 (2025) ("When a defendant is 18 years old at the time of the crime, a sentencing judge abuses their discretion when they fail to consider youthfulness when requested.").

---

[6] Notably, *Monschke* applies only to offenders under the age of 21 who receive a mandatory LWOP sentence following an aggravated first degree murder conviction. *In re Kennedy*, 200 Wn.2d at 24 (explaining the narrow "holding" from the plurality opinion in *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 326, 482 P.3d 276 (2021) (plurality)); *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 83-84, 514 P.3d 653 (2022) (holding that *Monschke* did not apply to a 21-year-old defendant sentenced under a different statute); *State v. Meza*, 22 Wn. App. 2d 514, 545, 512 P.3d 608 (explaining that *Monschke* did not extend mitigation for youthfulness to 21-year-old defendants), *review denied*, 200 Wn.2d 1021 (2022).

Here, while Lopez Leon acknowledges that his defense counsel asked for the trial court to consider his youthfulness at sentencing, he argues that his defense counsel's conduct still fell below "prevailing professional norms." He appears to argue simply that because the *Houston-Sconiers* factors "strongly support" him receiving a mitigated exceptional sentence, he was substantially prejudiced by his defense counsel's failure to request one. Suppl. Br. of Pet'r at 20.

We disagree that Lopez Leon's counsel was deficient for failing to expressly request a mitigated exceptional sentence based on youth. Defense counsel clearly highlighted Lopez Leon's youth at sentencing. He justified his request for a low-end sentence by emphasizing Lopez Leon's youth, his life circumstances, and social and emotional factors that contributed to his lessened culpability. The fact that defense counsel asked for a low-end sentence rather than an exceptional sentence below the range can be seen as a legitimate strategy. *See Bertrand*, 3 Wn.2d at 128. Given the seriousness of the crimes, it was not objectively unreasonable to conclude that there would be a greater likelihood of receiving a lower sentence if a specific low-end sentence was requested, rather than a sentence wholly outside of the standard range.[7] Thus, this aspect of Lopez Leon's ineffective assistance of counsel claim fails.

B. Failure to Request Running the Enhancements and Sentences Concurrently

Lopez Leon also argues that defense counsel's performance was deficient because they "failed to cite controlling precedent" regarding two aspects of his sentence, (1) running his firearm

---

[7] To the extent that Lopez Leon is also arguing that his defense counsel was deficient for not advocating that the trial court apply the *Houston-Sconiers* factors, this too was not deficient. As discussed above, sentencing courts are not required to consider the *Houston-Sconiers* factors in detail on the record if the defendant is 18 years of age or older. *See Nevarez*, 24 Wn. App. 2d at 61-62.

enhancements concurrently, and (2) running his serious violent offenses concurrently. Suppl. Br. of Pet'r at 20-21. First, appearing to rely on *Houston-Sconiers*, Lopez Leon contends that "sentencing court may run firearm enhancements concurrently." Suppl. Br. of Pet'r at 28-29. Second, he argues that "the Washington Supreme Court has authorized serious violent offense to be run concurrently." Suppl. Br. of Pet'r at 28.

Regarding the firearm enhancements, the State responds that Lopez Leon's reliance on *Houston-Sconiers* is misplaced and that it is "well established" that trial courts lack discretion to impose a mitigated exceptional sentence for firearm enhancements for adult offenders like Lopez Leon. Br. of Resp't at 60. The State argues that according to "[n]umerous" Washington opinions, firearm enhancements remain mandatory for adult offenders (even young adult offenders). On this point, the State contends that *Houston-Sconiers* is clearly limited to juveniles.

Regarding running Lopez's Leon's offenses concurrently, the State contends that Lopez Leon cannot show prejudice from his counsel's failure to request that the counts run concurrently because "the trial court refused to impose even a low-end sentence, thereby indicating no desire to impose an exceptional sentence." Br. of Resp't at 61.

We agree with the State on both arguments. First, with respect to the firearm enhancements, there is no support for the proposition that the trial court had the authority to run the enhancements concurrently. It is not deficient performance to avoid making a losing argument. *See State v. Brown*, 159 Wn. App. 366, 371, 245 P.3d 776 (defense counsel "has no duty to pursue strategies that reasonably appear unlikely to succeed"), *review denied*, 171 Wn.2d 1025 (2011).

Second, with respect to defense counsel's failure to request to run the sentences concurrently, even assuming deficient performance, Lopez Leon cannot show actual or substantial prejudice. Our opinion on direct appeal is conclusive on this point. There, we explained that, unlike the firearm enhancements, the trial court had the authority to run the sentences concurrently. But we also explained that although the trial court misunderstood its authority, it did not matter. We concluded,

> [T]here is no reasonable possibility that the trial court would have imposed an exceptional sentence downward by running the sentences concurrently even if it had understood its discretion to do so. Already aware of its discretion to impose an exceptional sentence based on Lopez Leon's youthfulness, the trial court refused, characterizing Lopez Leon's behavior as "deliberate, it was confident, and it was calculated." VRP (Nov. 19, 2021) at 18. The record is utterly devoid of any hint that the trial court would have made a different decision if it [had] understood there was a separate statutory route to impose a sentence under the standard range. Indeed, the trial court imposed a sentence above the low-end is a strong indication that the trial court had no desire to impose an exceptional sentence.

*Lopez Leon*, No. 56467-0-II, slip op. at 53.

For the same reasons, Lopez Leon cannot show a reasonable likelihood that the trial court would have run his counts concurrently even if his defense counsel had advocated for it. His ineffective assistance of counsel claim here also fails.

CONCLUSION

We deny Lopez Leon's petition.

17

No. 60505-8-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

VELJACIC, A.C.J.