IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32467-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| PATRICK ELLIOT PEARSON, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Patrick Elliot Pearson appeals his conviction for second degree burglary. Mr. Pearson's conviction was largely based on a surveillance video showing a person resembling him breaking into an animal shelter, and the resulting loss of his girlfriend's bullmastiff puppy from that shelter without her payment of a $120 recoupment fee. After reviewing Mr. Pearson's numerous contentions of error, we affirm.

## FACTS

Carmon Derting is the shelter manager for Grant County Animal Outreach. When she arrived to work the morning of September 16, 2013, she discovered damage to several of the shelter's doors and several dogs running around outside of their cages. After

completing an inventory, Ms. Derting discovered that a bullmastiff puppy was missing.

Ms. Derting reviewed the surveillance video from the previous night and called the

police. Officer Matthew Harum of the Moses Lake Police Department responded to the

call. He took photographs of the damage and reviewed the surveillance video with Ms.

Derting.

On January 9, 2014, the State charged Patrick Elliot Pearson with one count of

burglary in the second degree. Before trial, the court granted Mr. Pearson's motion to

represent himself and to assign his then-appointed counsel to serve as standby counsel for

trial. Mr. Pearson also filed a number of motions in limine, including one to prevent any

State witness, and particularly Officer Harum, from offering any testimony that Mr.

Pearson was the person in the surveillance video. In support of this motion, Mr. Pearson

argued there were no records of any previous contacts between Officer Harum and Mr.

Pearson. The court denied the motion in limine, stating:

> The officer should be permitted to testify that he viewed the surveillance
> video and that he recognized the person depicted on that video in the same
> way that he would be permitted to testify that "I saw a man walking across
> the street and I recognized that man." Mr. Pearson's appearance in court is
> not evidence so the jury has no basis to look at a video and say that is or
> isn't Mr. Pearson. So the officer's identification from the video, so long as
> he has the basis to do that, is admissible. And he has a claimed basis to do
> that. Mr. Pearson disagrees, but that goes to the weight and is subject to
> cross-examination and so on.

> If I can maybe help put that [in] context. For instance, if Mr. Pearson were to testify "I've never seen that officer before in my life anywhere," or "Until a week before this, I lived in Florida," or anything to that effect, that would call into question the officer's identification. But . . . so long as the officer testifies "I'm familiar with Mr. Pearson and I recognize him on the video," that's appropriate. So [Mr. Pearson's motion in limine] is denied.

Report of Proceedings (RP) (Apr. 9, 2014) at 14-15.

At trial, Officer Harum testified that when he viewed the surveillance video with Ms. Derting, he observed a bald white male and a female with darker hair approaching the back door of the building. Officer Harum stated he immediately identified Mr. Pearson as the male in the surveillance footage. When the State asked Officer Harum, "How sure are you that [it] was Mr. Pearson on that video?" he replied, "100 percent." RP (Apr. 9, 2014) at 34. Officer Harum stated he recognized Mr. Pearson because he previously had multiple contacts with Mr. Pearson while responding to other unrelated calls involving Rebecca Fleming, who owned the property where Mr. Pearson lived.

On cross-examination, Officer Harum was not able to recall the first time he met Mr. Pearson or if he had talked to him in the past. Officer Harum admitted that all of the information he relied on in identifying Mr. Pearson came from other people. Officer Harum also admitted that his identification of Mr. Pearson during a previous contact at Ms. Fleming's property was based on the name that had been provided to him by

3

someone else when responding to the call and also his review of Mr. Pearson's "previous law enforcement database record to include a previous booking photo." RP (Apr. 9, 2014) at 38. Officer Harum had never asked Mr. Pearson to see any identification and had never had occasion to ask Mr. Pearson for his name at any point in the past. The booking photograph was not admitted into evidence.

Ms. Derting testified that Ms. Fleming was the registered owner of the bullmastiff puppy that was taken from the shelter on September 15, 2013. During Ms. Derting's testimony about the history of the puppy, the court told Ms. Derting she could consult her record to refresh her recollection if necessary. The record was identified as the data entry from the shelter's "Animal View Report" for the dog. RP (Apr. 9, 2014) at 54. Mr. Pearson objected arguing that the State had not provided him with the data entry report during discovery, but the court overruled the objection. Using the data entry report, Ms. Derting testified that the puppy was brought to the shelter on September 10, and Ms. Fleming had not paid the $120 recoupment fee before the puppy went missing on September 15. Ms. Derting also testified that the puppy was picked up approximately four months after it went missing, and the street where the puppy was found was near the street where Ms. Fleming lived.

4

Mr. Pearson did not testify at trial and rested his defense on the cross-examination of Officer Harum regarding the officer's ability to identify him as the perpetrator. During closing arguments, the prosecutor stated that the person who broke into the animal shelter "was there to steal a . . . puppy." RP (Apr. 9, 2014) at 69. The prosecutor also stated that the offenders "damaged an inner door as well, which would be a separate crime." RP (Apr. 9, 2014) at 69. The prosecutor then emphasized Officer Harum's testimony about being "100 percent sure" that the person in the video was Mr. Pearson. RP (Apr. 9, 2014) at 71. The prosecutor stated, "[A]s part of his daily work [Officer Harum is] able to recognize who people are from looking at their faces and he's able to figure out who people are from looking at surveillance video so he can continue investigating." RP (Apr. 9, 2014) at 71. Then, the prosecutor told the jury, "We all have experience every day in making identifications of people's faces. Some of us are better at it than others." RP (Apr. 9, 2014) at 73. The prosecutor added, "Officer Harum had that experience with Mr. Pearson while the rest of us don't." RP (Apr. 9, 2014) at 73. Finally, the prosecutor told the jury:

> Ladies and Gentlemen of the Jury, when you consider all of the evidence in this case; which puppy was taken, who it belonged to, the relationship between Mr. Pearson and Ms. Fleming, the fact that we have Officer Harum tell us he knows with 100 percent certainty that was Mr. Pearson on that surveillance video. There's no reasonable doubt that Mr. Pearson is the person that committed that burglary on September 15 of 2013.

5

No. 32467-2-III
*State v. Pearson*

RP (Apr. 9, 2014) at 73-74.

After the evidence phase of trial, the court instructed the jury on reasonable doubt, stating in part:

> A reasonable doubt is one for which a reason exists, arising from the evidence or lack of evidence. It is such a doubt as a reasonable person would have after fully, fairly and carefully considering all of the evidence. If, from such a consideration, you have an abiding belief in the truth of the charge, then you are satisfied beyond a reasonable doubt.

Clerk's Papers (CP) at 19. The court also instructed the jury that:

> To convict the defendant of burglary in the second degree as charged, the State must prove each of the following elements of the crime beyond a reasonable doubt:
> (1) That on or about September 15, 2013, the defendant entered or remained unlawfully in a building;
> (2) That the defendant entered or remained in such building with the intent to commit a crime against a person or property therein; and
> (3) That said acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 20. The court further instructed the jury that "'[t]heft' means to wrongfully obtain or exert unauthorized control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services." CP at 22.

6

On April 10, 2014, the jury found Mr. Pearson guilty of second degree burglary. After the verdict, Mr. Pearson moved the court to arrest judgment or declare a mistrial under CrR 7.4 and CrR 7.5, respectively. The court denied the motion.

On May 6, 2014, the court sentenced Mr. Pearson to 60 months of confinement. In the judgment and sentence, the court imposed a total legal financial obligation (LFO) of $1,606.72, including discretionary costs of $750.00 and mandatory costs of $856.72. The judgment and sentence also contained the following finding: "The court has considered the total amount owing, the defendant's present and future ability to pay legal financial obligations, including the defendant's financial resources and the likelihood that the defendant's status will change." CP at 76 (citing RCW 10.01.160).

Mr. Pearson informed the court he had potential full-time work not only "definitely through the summer, but potentially beyond that." RP (May 6, 2014) at 42. He also stated he was close to getting his driver's license for the first time in 10 years after taking driving tests and obtaining SR-22 insurance. The record also shows that Mr. Pearson was 41 years old at the time of trial.

Mr. Pearson appeals contending the court erred in imposing discretionary LFOs without considering his financial resources under RCW 10.01.160(3). In a statement of additional grounds for review (SAG), Mr. Pearson also contends (1) insufficient evidence

supported his conviction for second degree burglary, (2) the State committed prosecutorial misconduct by failing to disclose Officer Harum as an expert witness, (3) the State committed prosecutorial misconduct by failing to disclose an old booking photograph of him, (4) the State committed prosecutorial misconduct by improperly bolstering Officer Harum's testimony with an "aura of reliability," (5) the trial court erred in permitting Officer Harum to offer impermissible opinion testimony on an ultimate issue to be determined by the jury, (6) the State violated his due process rights by failing to disclose exculpatory evidence, (7) the trial court erred in instructing the jury on reasonable doubt where the instruction omitted a phrase that is included in *11 Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01 at 85 (3d ed. 2008) (WPIC), and (8) cumulative error deprived Mr. Pearson of receiving a fair trial.

## ANALYSIS

Mr. Pearson contends that the trial court improperly imposed LFOs without considering his financial resources under RCW 10.01.160(3). He challenges $750.00 of discretionary costs consisting of a $750.00 fee for a court-appointed attorney. Mr. Pearson does not challenge the remaining $856.72 of mandatory LFOs consisting of the $500 victim assessment fee, the $200 criminal filing fee, or the $156.72 fee as restitution to the Grant County Animal Outreach in Moses Lake, Washington.

Mr. Pearson did not object to imposition of LFOs at the trial court level, but he contends that he may raise the issue for the first time on appeal under RAP 2.5(a). RAP 2.5(a) provides, in relevant part, that an appellate court "may refuse to review any claim of error which was not raised in the trial court." The rule goes on to provide three exceptions that allow an appeal as a matter of right. RAP 2.5(a). Mr. Pearson does not argue that one of the RAP 2.5(a) exceptions applies. Instead, he asks this court to exercise its discretion to review the issue. The Washington Supreme Court recently clarified that an appellate court's discretion under RAP 2.5(a) extends to review of a trial court's imposition of discretionary LFOs. *State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). While such unpreserved LFO errors do not command review as a matter of right, each appellate court is entitled to "make its own decision to accept discretionary review." *Id.* at 835.

Since *Blazina*, the Court of Appeals has struggled to announce a consistent rule for when it will review an unpreserved LFO argument. We recognize that there is a financial cost of ordering a new hearing. This cost involves security and transportation of an incarcerated person from prison to the county superior court that entered the sentence. Sometimes the amount of the discretionary LFOs imposed are significant *and* the likelihood of sentencing error is high; in such a case, the merits of ordering a new

9

sentencing hearing outweigh the costs of security and transportation. This is not the situation presented here, where the discretionary LFOs are $750. Nor do we consider the likelihood of sentencing error high. To the contrary, here, the lower court did engage Mr. Pearson in a colloquy to determine his future ability to pay. For these reasons, we use our discretion and deny Mr. Pearson's request that we review the adequacy of the evidence that supported the trial court's finding of present or future ability to pay LFOs.

## STATEMENT OF ADDITIONAL GROUNDS

1.     *Whether insufficient evidence supported Mr. Pearson's conviction for second degree burglary*

Mr. Pearson contends that by instructing the jury on the definition of "theft," but not "malicious mischief," the State effectively added theft as a necessary element of the charge for second degree burglary. Thus, the State was required to prove that Mr. Pearson committed the theft. Because the State failed to prove such theft, Mr. Pearson contends his conviction for second degree burglary is not supported by sufficient evidence and must be reversed.

For the second degree burglary charge, the State had to prove beyond a reasonable doubt that Mr. Pearson entered or remained unlawfully in a building other than a vehicle or a dwelling with intent to commit a crime against a person or property therein. RCW 9A.52.030. The court's to-convict instruction for second degree burglary set out

these elements. The court also included a definitional instruction for "theft," defining it as "wrongfully obtain[ing] or exert[ing] unauthorized control over the property or services of another, or the value thereof, with intent to deprive that person of such property or services." CP at 22. The court did not instruct the jury on the crime of malicious mischief. The information did not specify any predicate crime.

The State cites *State v. Bergeron*, 105 Wn.2d 1, 16, 711 P.2d 1000 (1985) for the proposition that it need not prove the specific crime intended to be committed during the burglary. The *Bergeron* court held:

> [T]he specific crime or crimes intended to be committed inside the burglarized premises is *not* an element of burglary that must be included in the information, jury instructions or in the trial court's findings and conclusions. It is sufficient if the jury is instructed . . . in the language of the burglary statutes.

105 Wn.2d at 16 (alteration in original). However, Mr. Pearson argues that under the law of the case doctrine, the State added theft as an element of burglary when it failed to object to the inclusion of the definitional instruction for theft.

Under the law of the case doctrine, jury instructions not objected to become the applicable law, even if the instructions contain an unnecessary element of the crime. *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). Thus, if an unnecessary

element is added in the to-convict instruction without objection, the State assumes the burden of proving the added element. *Id.*

The to-convict instruction here did not require the jury to find that Mr. Pearson intended to commit a theft, only that he "inten[ded] to commit *a crime* against a person or property therein." CP at 20 (emphasis added). We conclude that the State was not required to prove theft as an element of second degree burglary.

2. *Whether the State committed prosecutorial misconduct that prejudiced Mr. Pearson's right to a fair trial*

Mr. Pearson alleges several instances of prosecutorial misconduct, including: (1) failing to disclose Officer Harum as an expert witness, (2) failing to disclose a booking photograph relied on by Officer Harum in making his identification, and (3) improperly bolstering Officer Harum's testimony with an "aura of reliability."

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). "Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *Id.* at 703-04.

To prevail on a claim of prosecutorial misconduct, Mr. Pearson must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct

12

was both improper and prejudicial." *Id.* at 704. To prove prejudice, he must demonstrate a substantial likelihood that the misconduct affected the jury verdict. *Id.* Any errors not objected to at trial are waived unless Mr. Pearson "establishes that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Id.*

When reviewing claims of prosecutorial misconduct, this court should review the statements in the context of the entire case. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). "A trial court ruling on prosecutorial misconduct will be given deference on appeal." *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995). "'The trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.'" *Id.* (quoting *State v. Lord*, 117 Wn.2d 829, 887, 822 P.2d 177 (1991)).

*a. Failure to disclose Officer Harum as an expert witness*

Before trial, Mr. Pearson filed a motion in limine to prevent any State witness, including Officer Harum, from offering any testimony that Mr. Pearson was the person in the surveillance video. In support of this motion, Mr. Pearson argued there were no records of any previous contacts between Officer Harum and Mr. Pearson. The court denied the motion in limine and permitted the prosecutor to elicit testimony that Mr. Pearson "viewed the surveillance video and that he recognized the person depicted on that

13

video in the same way that he would be permitted to testify that 'I saw a man walking across the street and I recognized that man.'" RP (Apr. 9, 2014) at 14-15.

During the course of the trial, Officer Harum testified that he immediately identified Mr. Pearson as the male in the surveillance footage. Officer Harum stated he recognized Mr. Pearson because he previously had multiple contacts with Mr. Pearson while responding to other unrelated calls involving Rebecca Fleming, who owned the property where Mr. Pearson lived. The State then asked Officer Harum about his experience viewing surveillance videos and the following exchange occurred:

> [Prosecutor:] Okay. Now how often do you view surveillance videos as part of your job?
> [Officer Harum:] Anywhere from two to five times a week.
> [Prosecutor:] Why so?
> [Officer Harum:] People—other officers ask—
> MR. PEARSON: Objection. Calls for the witness to speculate.
> THE COURT: The objection is overruled. You may answer.
> [Officer Harum:] Other officers ask to see if any other officers recognize the subjects in the videos.
> [Prosecutor:] And do you often recognize people in videos?
> [Officer Harum:] I do.
> [Prosecutor:] How good is the quality of this video compared to other surveillance videos you look at?
> [Officer Harum:] I've seen worse and I've seen much better.

RP (Apr. 9, 2014) at 32-33. On re-direct examination, the State asked Officer Harum about his experience identifying people:

14

[Prosecutor:] Would you say that being able to identify a person from their face is an important part of your day-to-day work?

[Officer Harum:] Yes.

[Prosecutor:] And do you believe yourself to be good at that particular skill?

[Officer Harum:] Yes.

[Prosecutor:] Better than other officers?

MR. PEARSON: Objection.

THE COURT: Sustained for lack of foundation.

[Prosecutor:] Sure.

[Prosecutor:] Do you have reason to believe that you're [sic] visual recognition is better than your fellow officers?

MR. PEARSON: Objection.

THE COURT: Sustained. Calls for speculation.

[Prosecutor:] Do other officers often ask for your help in the field of recognizing people from their face or recognizing people in surveillance video?

[Officer Harum:] Yes.

[Prosecutor:] How often does that happen?

[Officer Harum:] It can happen anywhere between two to five times a week.

[Prosecutor:] To your knowledge do other officers in your department get asked as often to—

MR. PEARSON: Objection.

THE COURT: Sustained.

[Prosecutor:] Okay. Nothing further.

RP (Apr. 9, 2014) at 45-46.

After the jury reached its verdict, Mr. Pearson moved the court to arrest judgment or declare a mistrial under CrR 7.4 and CrR 7.5, respectively, arguing the prosecution committed misconduct by not revealing during discovery that it intended to call Officer

15

Harum as an expert in identifying people on surveillance videos. The judge denied the motion summarily, and the transcript for the proceedings is not in the record on appeal.

Here, Mr. Pearson argues that (1) the prosecutor committed misconduct by failing to inform the defense of the expected testimony of Officer Harum, and (2) that such testimony impermissibly qualified as expert witness testimony.

As for the disclosure issue, CrR 4.7(a)(1)(i) provides that the State must disclose, among other things, "the names and addresses of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witnesses." While "[t]he State's disobedience to a discovery rule can constitute a violation of a defendant's right to due process," the record here does not reveal that the State committed such disobedience. *State v. Greiff*, 141 Wn.2d 910, 920, 10 P.3d 390 (2000). The State's discovery responses have not been included in the record. But we can and will surmise that the State complied with its discovery obligation given Mr. Pearson's motion in limine that sought to prevent Officer Harum from testifying to his identity based on the surveillance video. Mr. Pearson would not have known to file a motion in limine had the State not previous to trial disclosed that Officer Harum would provide identification testimony based on the video.

16

As for the contention that Officer Harum was not properly disclosed as an expert witness, we disagree with the assertion that Officer Harum's testimony was in the nature of expert testimony. A witness may qualify as an expert if they have "scientific, technical, or other specialized knowledge" that will assist the trier of fact to understand the evidence. ER 702. In contrast, lay witnesses are permitted to testify about opinions and inferences that are (a) rationally based on the perception of the witness, (b) helpful to a determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. ER 701. A lay witness may give opinion testimony regarding the identity of a person in a surveillance photograph if there is some basis to conclude that the witness is more likely to be able to identify the defendant from the photograph than the jury. *State v. George*, 150 Wn. App. 110, 118, 206 P.3d 697 (2009) (quoting *State v. Hardy*, 76 Wn. App. 188, 190, 884 P.2d 8 (1994), *aff'd sub nom. State v. Clark*, 129 Wn.2d 211, 916 P.2d 384 (1996)).

Officer Harum testified that his identification of Mr. Pearson was based on prior contacts with Mr. Pearson in different contexts. There is nothing scientific, technical, or special about Officer Harum recognizing Mr. Pearson as the person in the video after having seen him before. Rather, Officer Harum's testimony identifying Mr. Pearson was

17

lay opinion, rationally based on his perception and helpful to the jury's determination of a fact in issue.

*b. Failure to disclose booking photograph*

Mr. Pearson contends the State committed prosecutorial misconduct by failing to disclose a booking photograph relied on by Officer Harum in making his identification.

A defendant's right to due process is violated if the State fails to disclose evidence material to guilt or punishment. CrR 4.7(a)(3); *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 396, 972 P.2d 1250 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). The obligation on the State to disclose this information is continuing. *Greiff*, 141 Wn.2d at 919.

Here, Officer Harum mentioned the booking photograph while being cross-examined by Mr. Pearson regarding his identification of Mr. Pearson during a past contact at Ms. Fleming's property. Mr. Pearson asked how Officer Harum was able to identify him during that contact, and Officer Harum responded, "Based on the name that was provided to me and your previous law enforcement database record to include a previous booking photo, I was able to identify you from a distance." RP (Apr. 9, 2014) at 38. Mr. Pearson repeated a similar question, and Officer Harum again responded, "Because I can look at a picture in my database and compare that photograph to you

18

standing there, just as I can anybody else." RP (Apr. 9, 2014) at 39. Mr. Pearson did not

object during this testimony, but he did argue as part of his CrR 7.4 and CrR 7.5 motions

that the prosecution committed misconduct by not revealing the photograph during

discovery. Again, the judge denied the motion summarily.

Mr. Pearson has not met his burden of proving how the prosecution's conduct in

not revealing the booking photograph was improper or prejudicial. As the record

indicates, Officer Harum only mentioned the photograph during questioning by Mr.

Pearson. Furthermore, Officer Harum's testimony only reveals he used the photograph to

identify Mr. Pearson in a previous contact when he investigated another matter at Ms.

Fleming's property, not when he was reviewing the surveillance video, as Mr. Pearson

contends. Thus, Mr. Pearson has not proved the State's failure to produce the photograph

materially affected the outcome of the trial. Moreover, had the State produced and the

court admitted the booking photograph from a prior, unrelated arrest, the photograph may

have been unduly prejudicial and a basis for reversal. *See State v. Sanford*, 128 Wn. App.

280, 285-87, 115 P.3d 368 (2005).

Finally, Mr. Pearson contends that the State had an obligation under CrR 4.7 to

disclose to him all of the particulars regarding the procedures used in identifying him.

However, he has not cited to a particular subsection of CrR 4.7 in support of his

argument, and a review of CrR 4.7 reveals no such requirement. While CrR 4.7(a)(1)(v) requires the State to disclose all books, papers, documents, photographs, or tangible objects that the State intends to introduce into evidence at trial, the State did not introduce the photograph here, so this subsection also does not apply.

### c. *Improperly bolstering Officer Harum's testimony with an "aura of reliability"*

Mr. Pearson contends that the prosecutor committed misconduct by making comments that improperly bolstered Officer Harum's identification testimony.

This court reviews a prosecutor's comments during arguments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Jones*, 144 Wn. App. 284, 290, 183 P.3d 307 (2008). "'A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury.'" *Id.* (quoting *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005)).

During opening statements, the prosecutor commented that Officer Harum was the "go-to person" in his department for identifying people on surveillance videos." RP (Apr. 9, 2014) at 4. Then, during closing arguments, the prosecutor emphasized Officer Harum's testimony about being "100 percent" sure that the person in the video was Mr. Pearson. RP (Apr. 9, 2014) at 71. The prosecutor stated, "The evidence you do have

before you is an officer who is unusually good with faces, who views two to five

surveillance videos a week, who other officers often ask to view surveillance videos to try

and make identification." RP (Apr. 9, 2014) at 70. The prosecutor also stated, "[A]s part

of his daily work [Officer Harum is] able to recognize who people are from looking at

their faces and he's able to figure out who people are from looking at surveillance video

so he can continue investigating." RP (Apr. 9, 2014) at 71. Then, the prosecutor told the

jury, "We all have experience every day in making identifications of people's faces.

Some of us are better at it than others." RP (Apr. 9, 2014) at 73. The prosecutor added,

"Officer Harum had that experience with Mr. Pearson while the rest of us don't." RP

(Apr. 9, 2014) at 73. Finally, the prosecutor told the jury:

> Ladies and Gentlemen of the Jury, when you consider all of the evidence in
> this case; which puppy was taken, who it belonged to, the relationship
> between Mr. Pearson and Ms. Fleming, the fact that we have Officer Harum
> tell us he knows with 100 percent certainty that was Mr. Pearson on that
> surveillance video. There's no reasonable doubt that Mr. Pearson is the
> person that committed that burglary on September 15 of 2013.

RP (Apr. 9, 2014) at 73-74.

Mr. Pearson did not object to the above portions of the prosecutor's opening

statement and closing argument. He did, however, raise issue with such comments as part

of his post-verdict CrR 7.4 and CrR 7.5 motions, which were then summarily dismissed.

21

While prosecutors "have some latitude to argue facts and inferences from the evidence, they are not permitted to make prejudicial statements unsupported by the record." *Jones*, 144 Wn. App. at 293. "And it is generally improper for prosecutors to bolster a police witness's good character even if the record supports such argument." *Id.*

Mr. Pearson specifically points to the prosecutor's statement during closing argument that Officer Harum was "unusually good" at making identifications to show it was not supported by the record. However, unlike other cases where the prosecutor bolstered officers' character with particularly subjective words and emphasized awards and commendations, the prosecutor's statements here did not go to character, but rather to an argument supported by the evidence: Officer Harum was particularly good at identifying faces from videos. The argument was not improper.

3.    *Whether the trial court erred in permitting Officer Harum to offer opinion testimony on an ultimate issue to be determined by the jury*

Mr. Pearson argues that the trial court erred in permitting Officer Harum to offer opinion testimony on an ultimate issue to be determined by the jury. Mr. Pearson specifically takes issue with Officer Harum's multiple responses indicating he was "100 percent" certain that Mr. Pearson was the male perpetrator in the surveillance video.

We review a trial court's decision to admit evidence using an abuse of discretion standard. *State v. Quaale*, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). "'Where

22

reasonable persons could take differing views regarding the propriety of the trial court's actions, the trial court has not abused its discretion.'" *Id.* (quoting *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001)). However, the trial court has abused its discretion if its ruling is contrary to law, or when its exercise of discretion is manifestly unreasonably or based on untenable grounds or reasons. *Id.* at 196-97.

One area where a court can err is when it admits opinion testimony that interferes with the jury's role in determining guilt. "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." *Id.* at 199. Before admitting opinion evidence in criminal trials, trial courts must consider various factors, including (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact. *Id.* at 199-200 (citing *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008)). The purpose of the inquiry is to balance the underlying basis of the opinion with the danger that the jury might give the opinion too much weight. For example, if the underlying factual basis of the opinion testimony is weak, but is testified to by a witness with independent authority, the danger is too high

23

that a jury will ignore the lack of real evidence and find guilt based simply on the authority of the witness.

Type of witness. Here, we have a law enforcement officer who provided opinion testimony. Such a witness is clothed with authority, and there is an inherent risk that a jury might substitute the lack of evidence for the officer's opinion in finding guilt. We therefore inquire carefully concerning the factual basis of the officer's opinion testimony.

Specific nature of the testimony. Officer Harum testified to what he saw on surveillance video. As mentioned previously, this testimony was proper based on foundation evidence that Officer Harum had multiple previous contacts with Mr. Pearson.

The nature of the charges and the type of defense. The charges and the defense focused on the surveillance video. Mr. Pearson's conviction or acquittal depended largely on whether the jury believed the person in the surveillance video was him. For this reason, there must be a substantial factual basis supporting Officer Harum's opinion testimony.

Other evidence before the trier of fact. Significantly, the jury was shown the same surveillance video seen by Officer Harum. This permitted the jury to determine what weight to give Officer Harum's identification. The video clearly shows the body, head, and face of the person who broke into the animal shelter. The video shows the same

24

person multiple times as he walked toward and away from the video camera over a period of several minutes. A rational trier of fact could reasonably give Officer Harum's identification testimony substantial weight. In essence, the jury's view of this critical evidence gave it a reliable basis for determining what weight to give Officer Harum's testimony. This assured that the jury did not abdicate its role as the ultimate finder of fact.

We hold that Officer Harum's opinion that he was 100 percent certain that the person in the surveillance video was Mr. Pearson did not deprive Mr. Pearson from having a fact critical to his guilt decided by a jury.

4. *Whether the State violated Mr. Pearson's due process rights by failing to disclose exculpatory evidence*

Mr. Pearson asserts the State violated his due process rights by withholding exculpatory evidence until the day of trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

"An asserted *Brady* violation, which implicates due process concerns, is reviewed de novo." *State v. Davila*, 183 Wn. App. 154, 166, 333 P.3d 459 (2014). "The prosecution has an affirmative duty to disclose evidence favorable to a defendant." *Id.* A *Brady* claim has three elements: (1) the State failed to disclose evidence that is favorable to the accused, either because it is exculpatory or impeaching, (2) the evidence must have

25

been suppressed by the State, either willfully or inadvertently, and (3) the undisclosed evidence was prejudicial. *Id.* at 167. "In analyzing these factors, [this court is] mindful that the fundamental purpose of *Brady* is the preservation of a fair trial." *Id.*

Mr. Pearson contends first that Grant County Animal Outreach's "Animal View Report" was exculpatory information. Ms. Derting testified that Ms. Fleming was the registered owner of the bullmastiff puppy that was taken from the shelter on September 15, 2013. During Ms. Derting's testimony about the history of the puppy, the court told Ms. Derting she could consult her record to refresh her recollection. The record was identified as the data entry from the shelter's "Animal View Report" for the dog. RP (Apr. 9, 2014) at 54. Mr. Pearson objected arguing that the State had not provided him with the report during discovery, but the court overruled the objection. Using the record, Ms. Derting testified, "The animal came in to [the shelter]" on September 10 and the shelter refused to release the animal back to Ms. Fleming until she had paid a $120 recoupment fee. RP (Apr. 9, 2014) at 53-54.

This testimony reveals that the "Animal View Report" simply provided the bullmastiff puppy's history at the shelter, including the date it came to the shelter. Based on this record, it does not appear the report provides any exculpatory or impeachment

evidence for Mr. Pearson. Instead, it establishes a foundation for the shelter's possession of the puppy prior to the burglary.

Second, Mr. Pearson contends that testimony that an animal control officer picked up the bullmastiff puppy four months after the burglary near Ms. Fleming's residence was also exculpatory information that the State suppressed. Mr. Pearson asserts this was exculpatory information because it suggested the puppy was returned to Ms. Fleming by whoever broke into the shelter, thereby negating the "intent to deprive the owner" element of the predicate crime of theft. However, as analyzed above, the burglary conviction did not require proof of a specific underlying crime. And even if it did, the State provided sufficient evidence that the shelter had a possessory interest in the bullmastiff puppy until the $120 recoupment fee was paid.

We conclude that the State's nondisclosure of the "Animal View Report" and evidence that inferred that Ms. Fleming had regained possession of the bullmastiff sometime after the burglary did not violate *Brady*.

> 5.    *Whether the trial court erred in instructing the jury on reasonable doubt where the instruction omitted a redundant phrase that is included in WPIC 4.01*

Mr. Pearson contends that the trial court erred in using a modified version of WPIC 4.01 that omitted the second use of the phrase "lack of evidence" to instruct the

jury on reasonable doubt. He argues that *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007) requires trial courts to use WPIC 4.01 and that any deviation from its language requires reversal. This court reviews de novo whether a challenged jury instruction accurately states the law without misleading the jury. *State v. Chino*, 117 Wn. App. 531, 538, 72 P.3d 256 (2003).

As a threshold matter, the State argues that because Mr. Pearson did not object to this instruction at trial, this court should not consider the issue on appeal under its RAP 2.5(a) authority to decline review. The record does not include either the State or Mr. Pearson's proposed instructions, so it is impossible to verify whether Mr. Pearson's proposed instruction differed from the instruction ultimately given to the jury. Mr. Pearson did not make any oral objections in the record. Nevertheless, we take this opportunity to address this contention to clarify this area of the law.

In *Bennett*, the Washington Supreme Court upheld the reasonable doubt instruction that the trial court gave, stating that it "satisfied the minimum requirements of due process," but directed trial courts to use only WPIC 4.01 in the future. 161 Wn.2d at 318. The court stated it was exercising its inherent supervisory power to so instruct Washington trial courts to use the approved pattern instruction WPIC 4.01. *Id.* The court reasoned, "Even if many variations of the definition of reasonable doubt meet minimal

28

due process requirements, the presumption of innocence is simply too fundamental, too central to the core of the foundation of our justice system not to require adherence to a clear, simple, accepted, and uniform instruction." *Id.* at 317-18.

The reasonable doubt instruction used here provided, in relevant part:

> A reasonable doubt is one for which a reason exists, arising from the evidence or lack of evidence. It is such a doubt as a reasonable person would have after fully, fairly and carefully considering all of the evidence. If, from such a consideration, you have an abiding belief in the truth of the charge, then you are satisfied beyond a reasonable doubt.

CP at 19. In contrast, WPIC 4.01 provides, in relevant part:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence *or lack of evidence*. [If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.]

(Emphasis added) (alteration in original). Thus, the only substantive change is the deletion of the second use of the phrase "lack of evidence." This is the omission that Mr. Pearson challenges.

Erroneous jury instructions are generally subject to a constitutional harmless error analysis. *State v. Lundy*, 162 Wn. App. 865, 871-72, 256 P.3d 466 (2011). An error is harmless under this analysis if the jury verdict would have been the same beyond a reasonable doubt absent an error. *Id.* at 872 (quoting *State v. Bashaw*, 169 Wn.2d 133,

29

147, 234 P.3d 195 (2010)). However, the other two divisions of this court are split over whether a harmless error analysis should apply for any violation of the *Bennett* court's mandate.

In *State v. Castillo*, 150 Wn. App. 466, 472-75, 208 P.3d 1201 (2009), Division One of this court rejected a harmless error analysis in this context. In *Castillo*, the defendant challenged the trial court's instruction defining reasonable doubt because it greatly varied from the definition found in WPIC 4.01. In rejecting the harmless error analysis, Division One reasoned the parties should have been aware of the *Bennett* opinion, which was released eight months before trial, and the error directly violated the *Bennett* mandate. *Id.* at 472-75. The court further reasoned that the Washington Supreme Court never commented on harmless error in *Bennett*, so the *Castillo* court could not infer that harmless error should apply. *Id.* Therefore, the *Castillo* court found that the offered instruction lessened the State's burden of proof. *Id.*

However, Division Two expressly rejected *Castillo* when confronted with the same issue in *Lundy*. 162 Wn. App. at 872-73. In *Lundy*, the trial court reversed the paragraph order of the standard WPIC 4.01 and modified the first three sentences regarding the State's burden of proof. *Id.* at 871. On appeal, the defendant argued the alterations to WPIC 4.01 required an automatic reversal of his conviction. Division Two rejected this

proposition, reasoning (1) the court in *Bennett* never held that modifying WPIC 4.01 automatically constitutes reversible error, and (2) the error was not structural and should thus be subject to constitutional harmless error analysis. *Lundy*, 162 Wn. App. at 872.

For obvious reasons, the State contends that this court should follow Division Two's decision in *Lundy* rather than Division One's decision in *Castillo*. For the reasons stated below, we choose a middle ground.

First, we reject the notion that minor nonsubstantive errors like those unchallenged here could be reversible error. For example, here, the trial court changed "such a doubt as would exist in the mind of a reasonable person" to "such a doubt as a reasonable person would have." We do not read *Bennett*'s direction to trial courts as requiring reversal for minor nonsubstantive changes. In saying so, we are not condoning trial courts to tinker with WPIC 4.01. Rather, we take this opportunity to warn trial courts that tinkering with WPIC 4.01 risks reversal if a reviewing court finds the change to be substantive.

Second, the error here is substantive because an important phrase from WPIC 4.01 was removed. Nevertheless, a comparison of the instruction given and WPIC 4.01 convinces us that the former did not lessen the State's burden. Because the substantive change here did not lessen the State's burden, reversal is not warranted. Indeed, had the instruction increased the State's burden, reversal would be putting form over substance.

31

We hold that a trial court's modification of WPIC 4.01 that is both substantive and that lessens the State's burden of proof is reversible error. Here, because the only substantive change was the deletion of a redundant phrase, the trial court did not commit reversible error.

6.    *Whether cumulative error deprived Mr. Pearson of receiving a fair trial*

Finally, Mr. Pearson asserts that the cumulative error doctrine applies to each of the errors he alleges. "Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *Id.* Here, we have rejected each of the alleged errors raised by Mr. Pearson. We likewise reject his cumulative error argument.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

32

32467-2-III

Korsmo, J., (specially concurring) — I agree with and have signed the majority opinion, but I write separately to note an additional reason to affirm the legal financial obligation (LFO) ruling—the trial court had an adequate factual basis for finding that Mr. Pearson could pay his LFOs. The topic was discussed at the sentencing hearing. Mr. Pearson assured the court that he had potential full-time employment for the summer and perhaps beyond that point.

This colloquy adequately established that Mr. Pearson was employable. The court shall not impose costs "unless the defendant is or will be able to pay them." RCW 10.01.160(3). A defendant who is capable of working full-time is thereby capable of earning money and thus would be able to pay his court costs. Capacity to work is the simplest and most straightforward means of establishing an ability to pay. The record reflects that ability here. The trial court's factual determination that Mr. Pearson could pay his modest LFOs is adequately supported in this record.

_____
Korsmo, J.